IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 19, 2012 Session

IN RE ETHIN E.S., ET AL

**Appeal from the Juvenile Court for Knox County**
**No. 121394      Tim Irwin, Judge**

_____

**No. E2011-02478-COA-R3-PT-FILED-MAY 31, 2012**

_____

Donna J.S. ("Mother") appeals an order terminating her parental rights to her minor children, Ethin E.S. and Mary J.C. (collectively "the Children"). The younger child, Ethin, was born drug-exposed and required intensive care for treatment of his withdrawal symptoms. As a result, the Department of Children's Services ("DCS") became involved. In the weeks after Ethin's birth, a protective order was entered and DCS took temporary custody of the Children. Following a two-day bench trial, the court found that there are multiple grounds for terminating Mother's rights and that termination is in the best interest of the Children, both findings by the court said to be based upon clear and convincing evidence. Mother challenges both of these determinations and, in addition, contends that DCS failed to provide reasonable efforts to assist her toward reunification with the Children. Finding no error, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

Andrew J. Crawford, Knoxville, Tennessee, for the appellant, Donna J.S.

Robert E. Cooper, Jr., Attorney General and Reporter; Joshua Davis Barker, Assistant Attorney General, Office of the Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

Robert W. Rogers, Knoxville, Tennessee, Guardian ad Litem.[1]

**OPINION**

I.

The trial on DCS's petition began on October 17, 2011. At that time, Mary, two and a half years old, and Ethin, ten months, had been in foster care for nearly nine months. There was scant evidence at trial regarding the status of the Children's father. Mother reported to DCS that, although she was married to Kenneth W. at the time of the Children's births, they were the biological children of Ralph C.[2] We summarize the underlying proof.

Mary and Ethin were born to Mother on May 9, 2009, and December 18, 2010, respectively. Mother reported to her care providers that she was using drugs during her pregnancy with Ethin. Testing showed the presence of opiates in Ethin's system at delivery. Ethin began suffering withdrawal symptoms the day after his birth. He was immediately transferred to the neonatal intensive care unit where he spent the next six weeks under treatment. Three months after the Children entered DCS custody, the trial court adjudicated them to be dependent and neglected in Mother's care; Mother stipulated to the underlying facts. Following Ethin's release from the hospital, he joined his sister in the same pre-adoptive foster care home where they both remained at the time of trial.

In January 2011, the family's case manager, Stephanie Grissom, together with other DCS team members and Mother, created a permanency plan that outlined the steps Mother needed to take to achieve reunification with the Children. Ms. Grissom reviewed with Mother the plan's requirements and the criteria for termination of her parental rights. Mother signed the plan indicating that she understood her responsibilities. According to Ms. Grisson, addressing Mother's drug use was of primary importance because it was the basis upon which the Children had been removed from her custody. Generally stated, the plan required Mother to (1) become drug-free by completing an intensive outpatient drug

---

[1]Mr. Rogers, on behalf of the Children, has filed a separate brief in support of the trial court's judgment.

[2]According to DCS's pleadings in the dependent and neglect proceeding, Mother last saw Mr. C in 2010 and believed that he was presently "on the run from the police." Mother remained married to Mr. W., but had not seen him in over 10 years; she had reason to believe he was recently released from prison and living in a halfway house. The record indicates that Mr. C executed a voluntary surrender of his parental rights, and that an August 2010 order terminated Mr. W.'s rights. Neither the alleged biological father nor the putative father appeared at trial and they are not parties on this appeal.

treatment program; (2) pass random drug screens; (3) resolve past criminal matters; (4) incur no new charges; (5) learn and demonstrate effective parenting skills; (6) provide a safe, stable environment for the Children; (7) obtain stable income and housing; (8) cooperate and maintain regular contact with DCS; and (9) pay child support as ordered. The plan had the dual goals of "return to parent" and "exit custody with relative."

Mother, 34, had a ninth-grade education. In addition to the Children, she had a son, age 16. Mother had work experience involving cleaning and in retail jobs, but was essentially unemployed during the pendency of the case except for a brief stint as a motel housekeeper. Mother subsisted mainly on food stamps and help from her father.

Much of the proof focused on Mother's drug use and related matters. Mother acknowledged her history of using narcotic pain medication. She stated that she had been taking oxycodone for back pain for over ten years, ever since she was in a "real bad" car accident while pregnant with her older son. She also had scoliosis. In 2010, while pregnant with Ethin, Mother lived in Florida. She said she received prenatal care there on three occasions from different doctors, but was unable to furnish their names. Mother said she took, *e.g.*, oxycodone, sleeping pills, and anti-depressants – "lots of different medications" – prescribed to her during her pregnancy. Questioned further, Mother was unable to name any of the doctors she saw for prenatal care and could not give specific locations or contact information for them or the pharmacies she had used. She explained that she was "running late" for court and did not bring evidence of her prescriptions, medical records, or referrals. Mother said "every doctor [she had] ever asked" had advised her that the use of painkillers during pregnancy had not been proven to cause any damage to pregnant women or their babies.

Mother returned to Knoxville, where Ethin was delivered. She said since the Children's removal, she had seen four different local physicians, all of whom had prescribed oxycodone for pain. At the start of the trial, Mother admitted that she continued to take pain medications as prescribed and agreed that she had never informed any of her doctors of a drug addiction. Mother took a drug screen on the first day of trial which was positive for hydrocodone. She said it was prescribed for her during a recent visit to the emergency room for her complaint of back pain and she had taken the last pill a week earlier. When trial resumed following a three-week break, Mother said she was not taking any medications, but had been referred to a pain clinic where she intended to go once her TennCare coverage was reinstated. Mother denied she had a drug problem, but conceded that she had indicated otherwise in earlier court proceedings and had signed a permanency plan wherein she agreed to resolve her drug problem as a condition for reunification with the Children.

The proof showed that Mother had made three attempts at addressing her drug use but failed to complete any of the programs. In January 2011, just after the Children's removal, she began an intensive outpatient program at New Life Recovery, where she attended eight of twenty scheduled sessions. Mother explained that she was discharged because of absences, which were the result of transportation problems. According to Mother, she was unable to get the transportation service to pick her up at the right time after she changed her class schedule. Further, she had lost the bus pass her case manager had given her. Mother said she called Ms. Grissom "like on a daily basis" to ask for help with transportation and getting into another treatment program, but it "took [Ms. Grissom] a while" to return her calls. Ms. Grissom testified that she returned Mother's phone calls within a day or two at the most. When Mother first indicated she had transportation issues, Ms. Grissom provided her with a bus pass that was good for 30 days and renewable upon request. She also spoke with the director at the treatment center, who confirmed that a transportation service was available to clients who called and made arrangements for the service.

In April 2011, Mother enrolled in a seven-day detoxification at CenterPointe. Her plan was to complete detoxification and move directly into CenterPointe's intensive outpatient treatment program. Mother stayed overnight for detoxification, but left the next day and did not return. Mother testified that she quit CenterPointe following a discussion with Carrie Berkely, the Child Protective Services assessor who initially worked on the Children's case. Mother testified: "[Ms. Berkely] said that if it's not a drug program, something I can complete, . . . I'm wasting my time." For her part, Ms. Berkely denied having a conversation to this effect or that she had ever counseled anyone against continuing a drug treatment option. Ms. Grissom also denied ever telling Mother that it would not help her to stay and finish the program. Mother said she waited several weeks to enter another program because she was unable to reach her case manager to get help finding a program that would accept her with no health insurance.

In June 2011, Mother was approved to begin an intensive outpatient program at Peninsula treatment center. Mother testified that she quit Peninsula because transportation was difficult and because it took a month for her to receive her second bus pass. Ms. Grissom reported that Mother attended three times, but consistently arrived late and left early, and was involuntarily discharged for lack of participation and attendance. According to DCS's notes, Mother's counsel at Peninsula reported, in Ms. Grissom's words, that Mother "wasn't ready for treatment" and "wasn't participating." By this time, Mother's insurance had run out, so Ms. Grissom advised her to apply for one of the grant or need-based programs she identified, and encouraged her to attend Alcoholics Anonymous and Narcotics Anonymous meetings while she waited to start a new program. Ms. Grissom testified that three weeks before trial began in October, Mother informed her that she was on a waiting list to reenter the Peninsula program.

Ms. Grissom reviewed the results of the random drug screens she administered. Mother tested positive for oxycodone four times between January and May of 2011, and also for cocaine on the last screen. In August and again just before trial, she was unable to provide a urine sample and failed to return later in the day as instructed. Ms. Grissom concluded that the drug screens indicated that Mother continued to use the same drugs that had caused her and the Children to be separated.

The court heard proof regarding Mother's other areas of responsibility under the permanency plan. Mother was arrested in June 2011 for failure to appear and served her sentence on a conviction for unauthorized use of a debit card. At the time of trial, her fines remained outstanding. Regarding Mother's need to "learn necessary parenting skills," Ms. Grissom provided her with a list of available parenting classes, advised her of those that were free, and encouraged her to register and attend a class. Mother provided no evidence that she had completed this task. Mother was required to obtain a legal source of income to support the Children and ordered to pay $110 a month per child in support. Her case manager confirmed that around June 2011, Mother got a cleaning job at Red Roof Inn, but said Mother quit after a week, purportedly to focus on attending a drug treatment program at Peninsula. Mother admitted she had never paid anything toward child support. As to the housing requirement, Mother left her apartment when the Children entered state custody because she considered it to be "unsafe." Since then, she had stayed with friends and relatives. With respect to her remaining responsibilities under the permanency plan, Mother regularly visited the Children and attended most of Ethin's doctor's appointments. According to Ms. Grissom, Mother's supervised weekly visits went well. Mother had shown appropriate behavior and interaction with the Children and Mary was especially excited to see her.

When the trial began, Mother was on a waiting list to enter a drug program at Helen Ross McNabb Center. When trial resumed the following month, she stated that she was also on a waiting list for outpatient treatment at Peninsula and expected to reenter that program within a few weeks. Mother was questioned with respect to her repeated references to transportation issues that she claimed left her unable to attend drug treatment programs. She conceded that the same transportation service she used to attend her doctor's appointments was available to transport her to a drug treatment program.

After trial began, Mother began attending weekly parenting classes through Child and Family Services. Mother said she had been pre-approved for public housing and expected to be notified of an available apartment within the next 14 days. Mother insisted she had made attempts to work through the permanency plan, but testified she had received no help. At the same time, she agreed, "[i]t looks that way, it really does. It looks like I've not done nothing" under the plan. Mother believed she could care for the Children, given more time

to complete the steps set out in the permanency plan. In her view, she had accomplished more in the two weeks before trial than in the previous 10 months and simply needed more time. Mother testified, "I'm getting housing, I'm getting into a drug program, I'm doing my parenting classes, and it's all because I've not worried about what [Ms. Grissom] has to say, not worried about getting in touch with her. . . ." Mother concluded, "nobody has given me a chance," and requested "a couple of more weeks, just to show I can do it."

Foster mother testified that the Children lived with her and her husband. Initially, Ethin needed a breathing machine to assist with some respiratory problems, but had since discontinued its use. Mary had suffered with ear infections, but had done well after having tubes placed in her ears. Foster mother described both children as generally healthy; they were not on medications and did not see any specialists. The Children called Foster Parents "Mommy" and "Daddy." Ms. Grissom testified that the Children were "doing wonderfully" in their foster home and described them as "happy and healthy kids. No developmental problems, they seem to be on target in all areas." She added that Foster Parents had already been approved as prospective adoptive parents and intended to adopt both children if they become available.

At the conclusion of the trial, the court found that four grounds for terminating Mother's rights to the Children were proven by clear and convincing evidence – (1) abandonment by failure to pay child support, *see* Tenn. Code Ann. §§ 36-1-113(g)(1) (2010) and 36-1-102(1)(A)(i) (2010); (2) severe child abuse against Ethin E.S., *see* Tenn. Code Ann. §§ 36-1-113(g)(4) and 37-1-102(b)(23)(A) (2010); substantial noncompliance with the permanency plan, *see* Tenn. Code Ann. § 36-1-113(g)(2); and persistent conditions, *see* Tenn. Code Ann. § 36-1-113(g)(3)(A)-(C). The court further found, also by clear and convincing evidence, that termination was in the Children's best interest. Mother timely filed a notice of appeal.

II.

Mother presents issues for this Court's review that we restate as follows:

> 1. The trial court erred by terminating Mother's parental rights because DCS failed to establish any statutory grounds for termination by clear and convincing evidence.
>
> 2. The trial court erred by terminating Mother's parental rights because DCS failed to make reasonable efforts to reunify the Children with Mother.

3. The trial court erred in finding that there was clear and convincing evidence to show that termination of Mother's rights was in the best interest of the Children.

III.

We employ the following standard of review in cases involving the termination of parental rights:

> [T]his Court's duty. . . is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is otherwise. *Id*.; Tenn. R. App. P. 13(d). In weighing the preponderance of the evidence, great weight is accorded to the trial court's determinations of witness credibility, which shall not be reversed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 744-45 (Tenn. 2002).

It is well established that parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interests of the child." T.C.A. § 36-1-113(c); *In re F.R.R., III*, 193 S.W.3d at 530. Both of these elements must be established by clear and convincing evidence. *See* T.C.A. § 36-1-113(c)(1); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. M.S., filed August 13, 2003), and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004).

-7-

IV.

A.

Mother first challenges the sufficiency of the evidence supporting the termination order. We consider the multiple grounds for termination in turn, mindful that "[t]he existence of any statutory basis for termination of parental rights will support the trial court's decision to terminate those rights." *In re C.T.S.*, 156 S.W.3d 18, 22 (Tenn. Ct. App. 2004) (citing *In re C.W.W., N.W.W., Z.W.W., & A.L.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000)).

B.

The trial court found that Mother abandoned the Children pursuant to Tenn. Code Ann. § 36-1-113(g)(1). That section references Section 36-1-102, which section defines "abandonment" for purposes of termination of parental rights in order to make a child available for adoption as follows:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition . . . that the parent(s) or guardian(s) . . . have willfully failed to . . . support or have willfully failed to make reasonable payments toward the support of the child;

Tenn. Code Ann. § 36-1-102(1)(A)(i). Further, under subsection (1), "willfully failed to support" or "willfully failed to make reasonable payments toward such child's support" means "the willful failure, for a period of four (4) consecutive months, to provide monetary support or the willful failure to provide more than token payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(D). In the present case, the relevant four-month period is from March 7, 2011 through July 7, 2011, the latter date being the date that the termination petition was filed. The trial court found clear and convincing evidence establishing this ground as follows:

> In the four (4) months preceding this filing, [Mother] according to child support records and by her own admission made no payments towards child support that was ordered on or about February 8, 2011. [Mother] was informed . . . that failure to pay child support could be a ground upon which her parental rights may be terminated as evidenced by her signature on the three

-8-

page . . . Criteria and Procedures for Termination of Parental Rights . . . . [Mother] further established that she had the capacity and ability to work when she testified that she held a job for a few days cleaning hotel rooms in the Summer of 2011.

Mother does not dispute that she never paid anything toward her $110 per month per child, court-ordered obligation. The gist of her argument is that "given the long list of tasks outlined in the Permanency Plan, . . . her failure to pay falls short of being . . . 'willful.' " She submits that the plan's requirements were "overwhelming" and suggests that because drug treatment was of paramount importance, it was "not unreasonable" for her to quit the one job she briefly held and remain unemployed in the months preceding the filing of the petition. The trial court rejected Mother's argument, as do we. In its bench ruling, the trial court elaborated on its finding of this ground:

> The child support standard to determine whether someone has . . . abandoned by willful failure to pay support, it's not if you have a job; it's whether you're able to get a job and work. And I can conclude in 10 or 11 months that there was time to complete intensive out-patient [program], get a job, work a job, and pay something toward support.

> Never in six years have I found non-payment of support to be a ground if somebody has paid a little bit along. When you pay nothing, I'm clearly convinced that you didn't support your children in custody. So I clearly and convincingly find abandonment by willful failure to pay support. I find this proof overwhelming.

In June 2011, nearly six months after the Children were placed in the custody of DCS, Mother got a job as a housekeeper at Red Roof Inn. Mother said she had just started work when she began drug treatment at Peninsula. Mother discussed her schedule with Ms. Grissom who, according to Mother, said "I suggest you quit your job because you know [intensive outpatient program] is more important." Mother conceded that she quit work and did not pay any of the money she earned that week toward her child support obligation. Moreover, three days later, she quit drug treatment. There was nothing to indicate that Mother sought work or any lawful source of income again during the critical four-month period when she neither worked nor entered another drug treatment program.

On our review, the evidence does not preponderate against the trial court's finding that Mother abandoned the Children by her willful failure to support them. The trial court did not err in terminating Mother's rights on this ground.

C.

The trial court terminated Mother's rights based upon its finding that Mother subjected Ethin to severe child abuse by exposing him *in utero* to her drug use. With respect to this ground, Tenn. Code Ann. § 37-1-102(b)(23)(A)(i) defines "severe child abuse" to mean:

> The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

The trial court made the following pertinent findings in support of its finding of severe child abuse:

> On March 8, 2011, [Mother] conceded that she has a problem with the abuse of prescription pain medication [by] consenting to a finding by clear and convincing evidence that [the Children] are dependent and neglected.
>
> * * *
>
> Although [Mother] claimed to have a prescription for these medications, she never produced any documentation supporting these claims, despite the fact that this Court previously advised her to be prepared to produce such proof. Accordingly, the Court concludes that . . . Ethin . . . is a victim of severe child abuse as that term is defined under T.C.A. § 37-1-102(b)(23)(A), because [Mother] did knowingly expose her child to a substantial risk or danger of serious bodily injury or death by means of her abuse of prescription pain medication during her pregnancy . . ., and did in fact cause serious bodily injury to her [C]hild . . . which caused the [C]hild to be hospitalized for nearly six weeks for treatment, in part, of Neonatal Abstinence Syndrome. . . . The Court does not find [Mother's] claims that she was informed by doctor(s) that her

-10-

prescription narcotic use during pregnancy did not pose a threat of harm to . . . Ethin to be credible. The Court would further note that the Tennessee Court of Appeals on several occasions has previously upheld trial court holdings that are based, in part, on findings that illicit drug use in the course of pregnancy constitutes severe child abuse and/or wanton disregard of the welfare of a child in termination of parental rights actions.

The trial court correctly noted that this Court has repeatedly held that a mother's prenatal drug use can constitute severe child abuse in termination of parental rights cases. In one such case, we analyzed the issue as follows:

[T]he juvenile court found that Mother had committed severe child abuse by using methamphetamine during her pregnancy with M.J.J. The court found that, by taking this illegal, controlled substance, Mother had exposed M.J.J. to a substantial risk of great bodily injury. We are inclined to agree. The record reflects Mother also ingested hydrocodone, alcohol and other non-prescribed over-the-counter medications. M.J.J. was born with tremors as a result of the prenatal exposure to these illicit drugs Mother was taking during her pregnancy. Fortunately, it appears that M.J.J. has otherwise enjoyed a healthy childhood. However, the healthy development of the child in this case does not diminish the severity of the harm to which the child was exposed. Therefore, we conclude that the record clearly supports the trial court's finding that Mother's prenatal drug use constituted severe child abuse for purposes of parental rights termination.

*In re M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305 at *8 (Tenn. Ct. App. M.S., filed Apr. 14, 2005). In *Cornelius v. Dep't of Children's Servs.*, 314 S.W.3d 902, 910-11 (Tenn. Ct. App. 2009), we reached the same conclusion in affirming a dependency and neglect adjudication. Therein, we held:

It is clear in this record that, throughout her pregnancy and beyond, Ms. Cornelius has abused myriad drugs. Despite efforts on the part of DCS to assist her in addressing her drug addiction, she has been unwilling to participate in that process. Moreover, the harm inflicted upon B.C. in this case is, by all testimony, an extremely severe case. This child has suffered horrible

withdrawal symptoms, and the full extent of his injuries may not be known until well into his childhood. We have closely examined the evidence in the record and have determined that the evidence does not preponderate against the trial court's specific findings of fact leading to its ultimate conclusions of law. In short, the facts found by the trial court clearly and convincingly support the conclusion that B.C. is dependent and neglected and that Ms. Cornelius engaged in severe child abuse.

Returning to the present case, Mother readily admitted that she used prescription narcotics and "lots of different medications" including hydrocodone, sleeping pills, and an anti-depressant during pregnancy, and that her drug use continued thereafter. Medical records confirmed that both Mother and Ethin tested positive for opiates at the time of Ethin's birth and further noted Mother's admitted use of Percocet and three to four packs of cigarettes per day while pregnant. Although she testified that she received prenatal care, during which time her doctors continued to prescribe pain medication and other drugs for her, there was no corroborative evidence to this effect. As the trial court put it, "[a]s of the final date of trial, . . . [Mother] had not produced a single scrap of paper to corroborate a single prescription for pain medication." Efforts by DCS to locate the health care facility, physicians, or pharmacies she reportedly visited while pregnant were unsuccessful. The court heard evidence of Ethin's lengthy hospitalization for treatment of his drug withdrawal symptoms resulting from his exposure to opiates. At the time of his discharge, the Child was still being weaned from his drug addiction and was ordered to continue taking Phenobarbital for several more weeks.

Mother asserts that severe child abuse was not demonstrated because she did not act "knowingly" with respect to her drug use while pregnant. She asserts that the "record is silent as to any doctor telling [her] that using her prescriptions would cause 'severe bodily injury or death' " to Ethin. We respond only that, owing to Mother's failure to produce any proof that she ever received prenatal care or valid prescriptions for narcotic pain medication while pregnant, any fault in this regard lies entirely with Mother.

On our considered review, the evidence preponderates overwhelmingly in support of the trial court's finding that Mother committed severe child abuse against Ethin. Mother's rights were properly terminated on this ground.

D.

In its bench ruling, the trial court made the following findings in support of its conclusion that termination was warranted as a result of Mother's substantial non-compliance with the permanency plan:

> [M]other did complete an alcohol and drug assessment. She hasn't picked up new criminal charges and seems to have resolved her other [criminal] matters . . . . However, she did not follow through with the recommendation of the alcohol and drug assessment. She has failed to complete four different programs that were either referred to her or that she referred herself to.
>
> She has failed to maintain suitable housing. She has failed to put herself back in a position where she can resume parenthood. . . . She admitted that she would not be ready to take the [C]hildren into her home now.
>
> These [C]hildren have been in custody since December 30th, 2010, been in foster care continuously since that date. If that's not a wake-up call, I don't know what is . . . . So you had ten months till today, closing in on 11 months really, to accomplish these tasks. And she got an alcohol and drug assessment. She hasn't accomplish another thing, not one other thing.

At trial, Mother testified that she had tried to resolve her drug abuse problems. She stated, "I have tried in every possible way that I can and something or someone keeps holding me back. . . ." As can be seen, the trial court essentially found that the only real obstacle was Mother herself. The proof reflects that Mother made minimal effort and little progress, particularly with respect to her drug habit. The evidence preponderates – again overwhelmingly – in favor of the trial court's finding of Mother's substantial failure to comply – by any measure – with the permanency plan during the many months after the Children's removal. The trial court did not err in terminating Mother's rights on this ground.

E.

The trial court also terminated Mother's rights pursuant to Tenn. Code Ann. § 36-1-113(g)(3)(A)-(C). That section, commonly referred to as "persistent conditions," establishes a ground for termination where:

-13-

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

In the present case, Mother's prenatal drug use was the basis for removing the Children from her care. The family's permanency plan identified Mother's drug use as a primary area to be addressed in order to achieve reunification. To this end, Mother was required to become and remain demonstrably drug-free. As we have discussed, other responsibilities were also assigned to Mother that would help her establish a safe, stable environment and allow her to properly parent the Children. The trial court summarized its findings with respect to this ground as follows:

> Without any serious doubt, . . . the [C]hildren have been removed . . . for a period exceeding six (6) months; the conditions which led to their removal still persist; i.e., [Mother's] substance abuse issue and the lack of appropriate housing, which in all probability would cause the [C]hildren to be subjected to further abuse and neglect and which, therefore, prevent the [C]hildren's return to the care of [Mother]; there is little likelihood that these conditions will be remedied at any early date, i.e., [Mother] has failed to successfully complete at least three (3) separate substance abuse treatment programs and is not currently enrolled in any other [such] program, so that these [C]hildren can be returned to [Mother] in the near future; and the continuation of the legal parent and child relationship greatly diminishes the [C]hildren's chances of early integration into a stable and permanent home.

-14-

The evidence showed that other than visiting the Children, Mother accomplished none of the plan's tasks or intended goals. Most significantly, she told the trial court she did not have a drug problem and insisted that she continued to use narcotic pain medications only as prescribed. Despite knowing that she needed to become drug-free, Mother admitted that she never told her current doctors that she had a drug problem or that treatment for her problem was a condition for the Children to be returned. Of the drug screens administered after the Children were placed in foster care, the first three were positive for oxycodone (and once for cocaine) and Mother was a "no-show" for the remaining two. Another test on the first day of trial was positive for the narcotic hydrocodone.

In short, at the time of trial, Mother's drug use continued. Nothing Mother did in the many months before trial would lead one to reasonably conclude that she was on track to end her drug use and make positive, lasting changes in her life that would allow her to become a suitable parent for her young children. The evidence does not preponderate against the trial court's finding of persistent conditions and its termination of Mother's rights on this ground.

V.

Mother asserts that DCS failed to make reasonable efforts to assist her in reunifying her family. In particular, she contends that DCS "simply ignored" her struggles with drug addiction. Mother concludes that "[t]ossing [her] a bus pass and a list of treatment providers falls far below reasonable efforts. . . ."

The trial court expressly found that "[DCS] ha[d] made reasonable efforts toward achieving permanency for these children." The court specifically cited Ms. Grissom's efforts at referring Mother for parenting classes at Child & Family services and her attempts to assist Mother "with addressing her substance abuse issue in order to establish a suitable home for the [Children],"all to no avail. The court found that "the State made very reasonable efforts and referred [M]other and arranged transportation . . . and offered bus passes" to assist Mother, but "[M]other either couldn't or wouldn't get it."

This Court has often acknowledged that "[t]he success of a parent's remedial efforts generally depends on the Department's assistance and support." *In re Giorgianna H*., 205 S.W.3d 508, 518 (Tenn. Ct. App. 2006) (citing *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *7 (Tenn. Ct. App. Mar. 9, 2004); *State Dep't of Children's Servs. v. Demarr*, 2003 WL 21946776 at *10. We have further observed, however, that

the manner in which the Department renders services must be *reasonable*, not herculean. In addition, the Department is not required to shoulder the burden alone. The parents must also make reasonable efforts to rehabilitate themselves and to remedy the conditions that required the removal of the children.

*In re Bernard T*., 319 S.W.3d 586, 601 (Tenn. Ct. App. 2010)(internal citations omitted; emphasis added). The reasonableness of the Department's efforts should be decided on a case-by-case basis in light of the unique facts of the case. *Id*. The proof at trial showed that the case manager, Ms. Grissom, worked to help Mother gain information and access to several different drug treatment programs and that she monitored Mother's attendance and progress. She also tried to keep Mother on course through random drug screens. After Mother stopped attending the first program and lost her health care coverage, Ms. Grissom gave her information on how to apply for different grant and need-based programs and encouraged Mother to begin a new program. When Mother informed her she was having transportation problems, Ms. Grissom provided her with a renewable bus pass and followed up with Mother's drug treatment program to arrange transportation service.

At trial, Mother conceded that once she enrolled in the various treatment programs, it was up to her to engage in the process and complete the required work, and there was little her case manager could do to help in this regard. Instead, the record reflects that Mother was able to start, but never finish, the various available programs. In our view, the proof showed that Mother failed to exert the same degree of effort to end her drug use as DCS and her drug counselors had put forth, leaving DCS little choice but to seek termination of her rights and permanence for the Children. The evidence does not preponderate against the trial court's finding that DCS made reasonable efforts in this case to assist Mother.

VI.

"The ultimate goal of every proceeding involving the care and custody of a child is to ascertain and promote the child's best interests." *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005). Once grounds for termination have been found, the focus of the proceedings shifts to the best interest of the child. *Id*. Having concluded that the trial court properly found grounds for terminating Mother's parental rights, we next consider whether the decision to

terminate is in the best interest of the Children. We are guided in our review by the relevant statutory factors set forth in Tenn. Code Ann. § 36-1-113(i).[3]

---

[3]The factors are as follows:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

-17-

In the present case, the trial court expressly analyzed each statutory factor in arriving at its conclusion that granting the petition to terminate was in the best interest of the Children. The court summarized its findings as follows:

> [T]his Court concludes that termination of [Mother's] parental rights is in the best interests of the [C]hildren . . . so that [they] can have permanency and can live in a drug-free home and grow up with expectations of having parents that are there for them and knowing where they are going to sleep every night and knowing where their home is going to be and knowing that no one is going to subject them to a life of drug use.
>
> *   *   *
>
> [DCS] has made reasonable efforts toward achieving permanency for these [C]hildren.
>
> The [C]hildren are entitled to a safe, secure and loving home. Both [C]hildren have found such a home with their present foster family where they are thriving. The foster parents are ready and willing to adopt in the event the [C]hildren are available for this to occur. [Mother] has failed to demonstrate any true commitment toward providing such a home for her [C]hildren.
>
> It is, therefore, in the best interest of [the Children] and the public that all of [Mother's] parents rights to these [C]hildren be terminated. . . .

Of the nine factors, the court found that only two weighed in Mother's favor – regular visitation and a meaningful relationship with the Children. *See* Tenn. Code Ann. § 36-1-113(i)(3), (4). The court found, however, that "[M]other's lack of progress toward establishing herself as a safe person to care for her children" outweighed any factors in her favor. As Ms. Grissom explained, "we need to make sure that she's clean and sober and can take care of these children." Most significantly, the court found that Mother's drug use certainly weighed in favor of termination. It noted that "[b]y her own admission [Mother] has chosen not to stop her abuse of prescription pain medication despite the fact that she knows that it is this very conduct that prevents the children from being returned to her care."

In short, over a year after these young children entered state custody, Mother had made no discernable progress on her permanency plan tasks and goals. As the trial court found, "there is scarce evidence, if any, that [Mother] could even meet the [C]hildren's most basic needs" because, DCS's reasonable efforts notwithstanding, she had not made "such an adjustment of circumstance, conduct, or conditions as to make it safe and in the [Children's] best interest to be in [her] home." *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). Most glaringly, Mother refused to acknowledge, much less address, her continuing abuse of pain medications.

The evidence does not preponderate against the trial court's thorough best-interest analysis. The trial court did not err in concluding that terminating Mother's rights so that these Children could form a permanent family bond with their prospective adoptive parents is clearly in their best interest.

VII.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Donna J.S. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE

-19-